**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| **TIMOTHY A. TABOR, DEBRA J. TABOR, and FARMERS INSURANCE GROUP,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**THE METAL WARE CORPORATION, a Wisconsin Corporation; NESCO/AMERICAN HARVEST, CORP., a Wisconsin Corporation; NEWCO of TWO RIVERS, INC., a Wisconsin Corporation; and UVALKO SHOPKO STORES, INC., a Minnesota Corporation,**<br><br>**Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br><br>**Case No.  2:99-CV-00503DAK**<br><br>**Judge Dale A. Kimball** |

This matter comes before the court on Defendants The Metal Ware Corporation and Newco of Two Rivers, Inc.'s (Metal Ware) motion for summary judgment.  The court held a hearing on the motion on August 5, 2008.  At the hearing, Ted Kannell and Gerry Holman represented Plaintiffs Timothy A. Tabor, Debra J. Tabor, and Farmers Insurance Group, and Michael Woolley represented Metal Ware.  Following the hearing, the court took the matter under advisement.  Now, having carefully considered the memoranda and additional materials submitted by the parties, as well as the relevant law and facts relating to the motion, the court renders the following Memorandum Decision and Order.

1

## BACKGROUND

### Factual Background

In 1995, Nesco/American Harvest (American Harvest) manufactured and distributed a line of home food dehydrators.  In August 1995, the United States Consumer Product Safety Commission (the Commission) issued a manufacturer's recall for 56,843 of these home food dehydrators, and American Harvest informed distributors that the dehydrators presented a potential fire hazard.

In 1996, the Tabors purchased one of these American Harvest home food dehydrators from ShopKo.  The recall was not in effect at the time the Tabors purchased the product.[1]  In November 1998, the food dehydrator caused a fire in the Tabors' home.

The Tabors paid cash for the home food dehydrator and have no record of their purchase.  Mr. Tabor testified, however, that "[w]ithin one month of the purchase of [the dehydrator] . . . , [he] completed a product registration card and returned the same to American Harvest.  The address [he] listed on the product registration card is the same" as his current address and he has "not moved or stopped receiv[ing] mail at [this] . . . address" from the time he returned the registration card.  Mr. Tabor also stated that in return for sending in the product registration card, the Tabors received a package of beef jerky flavoring from American Harvest.

In 1997, two years after the government recall and one year after the Tabors bought their home food dehydrator, Metal Ware purchased certain assets from American Harvest.[2]  According

---

[1] ShopKo and its distributor Englewood eventually entered into a settlement agreement with the Tabors and are not subject to this lawsuit.

[2] More precisely, Newco, a subsidiary of Metal Ware, purchased American Harvest's assets.  Metal Ware, however, formed Newco for the sole purpose of purchasing the assets, and after the transaction was complete, Newco merged

to Metal Ware, the company's primary purpose in making the acquisition was to obtain rights to American Harvest's line of home food dehydrators. Following the acquisition, Metal Ware continued to sell food dehydrators under the American Harvest trade name, including the model purchased by the Tabors. Metal Ware never manufactured, sold, or otherwise distributed the Tabors' food dehydrator unit.

Following the acquisition, Metal Ware sent a letter to retailers that had carried American Harvest products, advising that Metal Ware "will soon be filling your product needs with the American Harvest brand of the finest in [e]lectric [d]ehydrators and [a]ccessories." On July 1, 1997, Metal Ware, operating under the American Harvest trade name, sent a letter to service centers that had previously serviced American Harvest products. The letter informed the service centers of American Harvest's new ownership and advised that "[w]arranties for all products produced by American Harvest will be honored." The letter also stated that all claims should "be processed in the same manner" and service centers should "use all service repair manuals and price sheets issued previously."

Under the service center agreement (Service Agreement), attached to the July 1, 1997 letter, contracting service centers agreed to appointment as authorized service centers for American Harvest products and agreed to provide maintenance and repair service for products manufactured and distributed by American Harvest. The Service Agreement further stated that "[a]ll repairs, maintenance[,] and servicing provided [by the contracting service centers would] be in full and complete compliance with all directives, recommendation[s,] and procedures that [American Harvest] establishe[d]" and American Harvest "agree[d] to sell to [the service center]

---

with Metal Ware and ceased to exist.

. . . repair parts and attachments at prices contained in [the company's m]aster [p]arts [p]rice [l]ist."

Linda Youngchild, the corporate secretary, treasurer, and record keeper for Metal Ware, testified that Metal Ware was not responsible for American Harvest products remaining on store shelves at the time of the acquisition but that "there may have been cases where someone sent a product in that needed a warranty repair that [the company] may have done something with, repaired it at no charge or replaced it at [Metal Ware's] option. . . .  But [the company] assumed no liabilities so [it] didn't have to do anything with product that was already on store shelves." Youngchild also explained that Metal Ware stood behind American Harvest goods that were in inventory at the time of the acquisition and were later sold by Metal Ware.

According to Youngchild, American Harvest had maintained a consumer data base and this data base was part of the asset purchase agreement between American Harvest and Metal Ware.  The two companies combined had maintained the database from 1992 until 2004.  The consumer data base records were primarily based on warranty or product registration cards sent in by consumer purchasers.  The data base also had records for those consumers who had made phone contact with the companies.  Although Youngchild testified that the Tabors should have been listed on the database, the database has no record of the Tabors.  Nor does the database reflect that the Tabors and Farmers Insurance made a number of phone calls and sent correspondence to Metal Ware between December 30, 1998, and February 2, 1999.

Youngchild testified that she had not reviewed all the hard copy sales files that American Harvest gave to Metal Ware at the time of the acquisition and did not know what information might be contained in these files.

In 1997, Metal Ware was notified of a fire in an Oklahoma home involving the same model of home food dehydrator that caused the Tabors' house fire.  Metal Ware did not warn ShopKo of the potentially hazardous nature of the food dehydrator, despite knowing that, as of August 1998, ShopKo and its distributor, Englewood, had inventories containing approximately 2000 of the potentially defective American Harvest home food dehydrators.  Nor did Metal Ware notify the Commission or contact purchasers.

**Procedural History**

### *Federal District Court*

 The Tabors filed their original products liability complaint against Metal Ware in federal court in 1999.  In 2003, Judge Campbell granted summary judgment in favor of Metal Ware as to any claim of liability under a distribution theory because the undisputed facts demonstrated that Metal Ware was not in the chain of distribution.  She also granted summary judgment as to the Tabors' two claimed exceptions to the general rule of successor nonliability for defective products of a predecessor company—the continuity of enterprise exception and the product line exception—because Judge Campbell determined that Utah law only allowed for four exceptions, none of which the Tabors had argued, and did not include the Tabors' two claimed exceptions. Judge Campbell, however, denied summary judgment as to any claim of liability under a duty to warn theory, concluding that Utah law would impose an independent post-sale duty to warn on successor corporations and that a genuine issue of material fact existed regarding this issue.[3]

In 2005, Metal Ware again moved for summary judgment on the issue of causation and

---

[3] Judge Campbell also denied Metal Ware summary judgment to the extent it relied on the No Assumption of

damages.  The Tabors filed a motion for partial summary judgment on the issue of liability.   In its motion for summary judgment, Metal Ware argued that the evidence showed that, even if a warning had been provided to ShopKo by Metal Ware, the warning would not have reached the Tabors, and therefore, Metal Ware's failure to warn ShopKo could not be the proximate cause of any damages to the Tabors.

Metal Ware based its lack of causation argument on the deposition testimony of Shelley Schroeder, the only ShopKo witness.  At the time of the deposition, and for three years prior, Schroeder worked as ShopKo's director of vendor compliance and oversaw recall procedures for the retailer.  Prior to becoming director, Schroeder worked as a product compliance coordinator for ShopKo.  Schroeder testified that over the course of her seven years with the company, she had dealt with approximately one-hundred recalls and approximately twenty product warnings not involving recalls.  Schroeder testified as to ShopKo's product recall procedures.  She testified that she "did not know" what ShopKo would have done if Metal Ware had provided direct notice to ShopKo because ShopKo had no written policies or procedures for handling such a direct warning.  According to Schroeder, the retailer does not have a separate procedure from that applicable to recalls, and she could not recall ShopKo ever posting warnings without the Commission actually issuing a product recall.  Schroeder described ShopKo's procedure for handling recalls as the following:  when a vendor contacts Schroeder concerning a products safety issue, she first asks if the vendor has contacted the Commission, and, if not, when the vendor will contact the Commission; if the vendor does not contact the Commission after a given period of time, Schroeder will contact the Commission directly; and once the vendor, or

Liabilities Clause in the asset purchase agreement between Metal Ware and American Harvest.

Schroeder, has contacted the Commission, ShopKo waits to hear from the Commission regarding

the proper course of action.  Schroeder also testified that if she had received notice from Metal

Ware regarding the defective home food dehydrator, she would have, in adherence to ShopKo

procedure, met with corporate counsel to discuss the company's future actions, including

determining the severity of the safety issue.  According to Schroeder, if she and corporate

counsel determined there was a "severe quality issue" or "if there was injury or death," they

would decide "whether or not the product should be pulled from [ShopKo] shelves or not before

the [Commission] issued a recall."  Schroeder testified that if ShopKo had received a warning

from Metal Ware concerning the food dehydrator's fire danger, the retailer would have pulled

the product from the shelves.  She did not indicate that the company would have posted

warnings.

Judge Campbell granted summary judgment in favor of Metal Ware as to causation,

ruling that the Tabors had failed to establish that their damages resulted from Metal Ware's

failure to warn.  Judge Campbell determined that, even assuming that Metal Ware owed a duty to

warn to ShopKo, any failure by ShopKo to warn could not be the proximate cause of the Tabors'

damages because there is no evidence that such a warning would have reached the Tabors, and

the inferences required to find causation constituted speculation and conjecture.  Specifically,

Judge Campbell stated that

> The effect of . . . Schroeder's testimony, taken in a light most
> favorable to Plaintiffs, is the inference that if Metal Ware had
> contacted ShopKo, ShopKo would have told Metal Ware to
> contact the [Commission] and pulled the [dehydrator] from the
> shelves.  Metal Ware would have then initiated a second recall and
> notified ShopKo that it should post notices.  ShopKo would then
> have posted notices which would have been seen and heeded by
> the Tabors.  Pulling the [product] from the shelves would have

been sufficient to alert the Tabors to the potential fire danger and the inferences required to find causation necessitate a great deal of speculation and conjecture without facts sufficient to create a genuine issue of material fact.[4]

Judge Campbell also concluded that there were only speculative facts to support the Tabors' assertion that Metal Ware's failure to warn the Tabors directly was the proximate cause of the fire. Judge Campbell acknowledged that American Harvest maintained a consumer data base that Metal Ware acquired as part of the asset purchase agreement; that the data base records were primarily based on warranty or product registration cards that buyers had mailed in; that these records had been maintained from 1992 until 2004; that the Tabors registered their purchase of the home food dehydrator and contacted Metal Ware directly; and that the Tabors should have been included in this database. Judge Campbell noted that while Metal Ware's lack of record of the Tabors raised questions as to why the Tabors were not included in the consumer database, such questions were ultimately immaterial as to whether Metal Ware could have warned the Tabors prior to the fire that occurred on November 19, 1998.

### *Tenth Circuit and Utah Supreme Court Rulings*

The Tabors appealed these federal court decisions to the Tenth Circuit Court of Appeals. The Tenth Circuit stayed the appeal pending resolution of the following questions that it certified to the Utah Supreme Court: (1) "Does Utah law recognize an exception to the general rule of successor nonliability under the circumstances of this case?"; (2) "Does Utah law impose on successor corporations a post-sale duty to warn customers of defects in products

---

[4] Additionally, Judge Campbell noted that the Tabors failed to assert any fact that indicated what the Commission would have done if it had received word of the 1997 fire, concluding that the asserted "[c]hain of logic [was] simply too speculative."

manufactured and sold by the predecessor corporation?"; and (3) if a post-sale duty to warn

exists, "What factors are considered in determining whether a successor has discharged that

duty?" *Tabor v. The Metal Ware Corporation, et al.*, 2007 UT 71, ¶ 1, 168 P.3d 814.  Upon

review, the Utah Supreme Court "conclude[ed] that Utah adheres to the traditional rule of

successor nonliability, subject to four exceptions, as set forth in section 12 of the Restatement

(Third) of Torts."  *Id*. at ¶ 6.  Section 12 of the Restatement provides:

> A successor corporation or other business entity that acquires
> assets of a predecessor corporation or other business entity is
> subject to liability for harm to persons or property caused by a
> defective product sold or otherwise distributed commercially by
> the predecessor if the acquisition:
> (a) is accompanied by an agreement for the successor to assume
> such liability; or
> (b) results from a fraudulent conveyance to escape liability for the
> debts or liabilities of the predecessor; or
> (c) constitutes a consolidation or merger with the predecessor; or
> (d) results in the successor becoming a continuation of the
> predecessor.

Restatement (Third) of Torts:  Products Liability § 12 (1998).  The Utah Supreme Court refused

to adopt the Tabors' two claimed exceptions to the general rule of successor non-liability:  the

product line exception and the continuity of enterprise exception.  *See id*. at ¶ 11.

The Utah Supreme Court also determined that "Utah imposes on a successor corporation

an independent post-sale duty to warn of a predecessor corporation's product defects under the

conditions outlined in section 13 of the Restatement (Third) of Torts."  *Id*.  Section 13 provides

that

> (a) A successor corporation or other business entity that
> acquires assets of a predecessor corporation or other business
> entity, whether or not liable under the rule stated in § 12, is subject
> to liability for harm to persons or property caused by the
> successor's failure to warn of a risk created by a product sold or

distributed by the predecessor if:
    (1) the successor undertakes or agrees to provide services for maintenance or repair of the product or enters into a similar relationship with purchasers of the predecessor's products giving rise to actual or potential economic advantage to the successor, and
    (2) a reasonable person in the position of the successor would provide a warning.
      (b) A reasonable person in the position of the successor would provide a warning if:
    (1) the successor knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and
    (2) those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and
    (3) a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and
    (4) the risk of harm is sufficiently great to justify the burden of providing a warning.

Restatement (Third) of Torts:  Products Liability § 13 (1998).  The Utah Supreme Court left it to the federal court to apply the duty to warn standard outlined above to the facts of this case.  The court stated that

> [i]f a successor corporation has a duty to warn under section 13, one factor in determining whether a successor corporation has discharged its duty to warn is whether it provided warning to the end user, not just an intermediate like a distributor or retailer.  In making this determination, the successor has a duty to only warn the end user if it has a reasonable means of doing so.  Another factor to consider in this case might be the effect of the closed . . . recall.  Other factors may be relevant, but the factual development of this case is insufficient for [the court] to identify them.

*Tabor*, 2007 UT 71 at ¶ 13.

Following the Utah Supreme Court decision, the Tenth Circuit received and considered supplemental briefing regarding the impact of the Utah Supreme Court decision.  On October 18, 2007, the Tenth Circuit issued the following order:

> Upon consideration of the response to our certified questions and
> the briefs filed in response to our order dated September 12, 2007,
> we VACATE the district court's order entered May 20, 2005[,] and
> the judgment entered that same day, and REMAND for additional
> proceedings consistent with the opinion of the Utah Supreme
> Court. We make no comment on the outcome of those proceedings,
> and defer to the district court with respect to the appropriate scope
> of the proceedings. The mandate shall issue forthwith.

*Tabor v. Metal Ware Corp.*, 251 Fed.Appx. 577, 2007 WL 3046317, at *1 (10th Cir. 2007).

**Current Procedural Posture**

Following the Tenth Circuit remand to the federal district court, Judge Campbell

recused.  On February 19, 2008, Metal Ware filed for summary judgment on the issues of duty

and causation.

**DISCUSSION**

Pursuant to Federal Rule of Civil Procedure 56(c), Metal Ware moves for summary

judgment against the Tabors.  *See* Fed. R. Civ. P. 56(c).  Metal Ware argues that it is entitled to

summary judgment on several grounds.  First, Metal Ware claims that summary judgment is

appropriate because this court is obligated, pursuant to the law of the case doctrine, to adhere to

Judge Campbell's prior ruling on causation.  Second, Metal Ware contends that regardless of the

law of the case doctrine, summary judgment is nonetheless proper because, as Judge Campbell

ruled, the Tabors proffer no evidence to support causation.  Finally, Metal Ware argues that it is

entitled to summary judgment because under recently defined Utah law regarding successor

liability for failure to warn of risks created by a product sold or distributed by the predecessor,

the undisputed facts demonstrate that Metal Ware had no duty in this case to warn of the

defective home food dehydrator.

## I.    Legal Standard

Summary judgment is only proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In reviewing a motion for summary judgment, the relevant inquiry for the court is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. . . .  [S]ummary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1179 (10th Cir. 2007) (alterations in original) (quoting *Bingaman v. Kan. City Power & Light Co.*, 1 F.3d 976, 980-81 (10th Cir. 1993)).  When applying the summary judgment standard, the court "view[s] the record in the light most favorable to the nonmoving party." *Mercer Transp. Co. v. Greentree. Transp. Co.*, 341 F.3d 1192, 1194 (10th Cir. 2003).

## II.    Law of the Case Doctrine

The court refuses to grant summary judgment to Metal Ware on the basis that, pursuant to the law of the case doctrine, this court must adhere to Judge Campbell's prior ruling that no causation exists.  The law of the case doctrine provides that, "once a court decides an issue, the same issue may not be relitigated in subsequent proceedings in the same case." *Grigsby v. Barnhart*, 294 F.3d 1215, 1218 (10th Cir. 2002) (quotations and citation omitted).  As correctly noted by the Tabors, the doctrine is inapplicable in cases, such as here, where an appellate court vacates a court's prior decision. *See Johnson v. Bd. of Educ. of City of Chicago*, 457 U.S. 52,

53-54 (1982); *Franklin Savings Ass'n v. Office of Thrift Supervision*, 35 F.3d 1466, 1469 (10th Cir. 1994) ("A judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel."); *Mason v. Texaco, Inc.*, 741 F. Supp. 1472, 1492 (D. Kan. 1990) ("Normally when an appellate court vacates a judgment, neither a collateral nor direct estoppel, nor the law of the case will give preclusive effect to this judgment.").

### III.    Causation

Metal Ware claims that, even disregarding the law of the case doctrine, Judge Campbell correctly ruled that causation in this case was nothing more than speculation and conjecture because the Tabors proffered no evidence that Metal Ware could have provided a warning to the Tabors directly and no evidence that a warning from Shopko would have ultimately reached the Tabors. Upon review, this court concludes that it is not appropriate in this case to determine the issue of causation as a matter of law.

In Utah, the general rule is that causation "cannot be resolved as a matter of law." *Butterfield v. Okubo*, 831 P.2d 97, 106 (Utah 1992). This rule stands because "caus[ation] is an issue of fact [and therefore the court] refuse[s] to take it from the jury if there is any evidence upon which a reasonable jury could infer causation." *Id.*; *see also Harline v. Barker*, 854 P.2d 595, 600 (Utah Ct. App. 1993) ("[O]nly if there is no evidence upon which a reasonable jury could infer causation, is summary judgment appropriate."). "In other words, Utah litigants do not easily dispose of the element of causation on summary judgment." *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1292 (Utah Ct. App. 1996).

Metal Ware first claims that the undisputed facts indicate that the company did not know of the Tabors and did not know that the Tabors had purchased the food dehydrator until after the Tabors' fire occurred, and therefore, the company could not have provided a warning directly to the Tabors.  The court does not disregard or minimize Youngchild's testimony that the Tabors were not listed in the company's consumer database, despite having sent in a product registration card for the food dehydrator, and that therefore Metal Ware had no knowledge of the Tabors until they called to complain about the fire.  But the court is nonetheless troubled by further testimony from Youngchild that Metal Ware has a hard copy of all sales files that American Harvest gave to Metal Ware at the time of the acquisition; that Metal Ware has not reviewed all these files; and that the company does not know what information might be contained in these files.  Although Metal Ware claims that the Tabors were not identified in these sales files, Youngchild's testimony, at the very least, renders such a conclusive claim confusing and undermines the court's confidence that no issues of material fact exist as to whether Metal Ware could have warned the Tabors directly.

Metal Ware's second claim regarding causation is that there is no evidence that, even if Metal Ware had informed ShopKo of the potential fire danger, a warning from Shopko would have ultimately reached the Tabors.   In support of this contention, Metal Ware relies on Schroeder's testimony that had ShopKo received a warning from Metal Ware the retailer would have pulled the home food dehydrator from store shelves.  Metal Ware reads Schroeder's testimony to mean that Shopko would not have posted a warning and therefore there is no evidence to suggest a warning would have reached the Tabors and prevented their purchase of the damage-causing product.  In the court's mind, however, the Tabors' failure to show that a

14

warning from ShopKo would have reached them does not necessarily close the proximate cause door. The question is not whether ShopKo would have warned the Tabors. Rather, the question is whether the food dehydrator would have caused injury to the Tabors had Metal Ware provided a warning to ShopKo. Schroeder's testimony that ShopKo would have pulled the potentially dangerous dehydrators off store shelves had the retailer received a warning from Metal Ware permits the reasonable inference that these dehydrators would not have been on ShopKo shelves at the time the Tabors made their purchase. If the potentially hazardous food dehydrators were not on ShopKo shelves, and thus unavailable for purchase, it is not so speculative and tenuous for a reasonable juror to assume that the fire in the Tabors' home would not have occurred.

In sum, this court is not comfortably convinced that "there is *no* evidence [in this case] upon which a reasonable jury could infer causation." *Harline*, 854 P.2d at 600 (emphasis added). Accordingly, the appropriate action for the court is to deny summary judgment on the question of causation.

## IV.    Duty to Warn

Despite this court's decision that summary judgment is improper on the question of causation, the court may nonetheless grant summary judgment in favor of Metal Ware if the court determines that the undisputed facts reveal that Metal Ware owed no duty to warn as a matter of law. As earlier noted, the Utah Supreme Court, upon certification from the Tenth Circuit Court of Appeals, determined in *Tabor v. Metal Ware*, 2007 UT 71, 168 P.3d 814, that "Utah imposes on a successor corporation an independent post-sale duty to warn of a predecessor corporation's product defects under the conditions outlined in section 13 of the Restatement (Third) of Torts." *Id.* at ¶ 13. Section 13 of the Restatement provides that

(a) A successor corporation or other business entity that acquires assets of a predecessor corporation or other business entity, whether or not liable under the rule stated in § 12, is subject to liability for harm to persons or property caused by the successor's failure to warn of a risk created by a product sold or distributed by the predecessor if:

    (1) the successor undertakes or agrees to provide services for maintenance or repair of the product or enters into a similar relationship with purchasers of the predecessor's products giving rise to actual or potential economic advantage to the successor, and

    (2) a reasonable person in the position of the successor would provide a warning.

(b) A reasonable person in the position of the successor would provide a warning if:

    (1) the successor knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and

    (2) those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and

    (3) a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and

    (4) the risk of harm is sufficiently great to justify the burden of providing a warning.

Restatement (Third) of Torts:  Products Liability § 13 (1998).

In support of its Motion for Summary Judgment, Metal Ware argues that in applying section 13 to the present case "it is immediately clear that the required independent, ongoing special relationship between Metal Ware and the Tabors that would justify imposing an independent duty of care does not exist."  Specifically, Metal Ware claims that it never agreed to service, maintain, or repair the Tabors' specific home food dehydrator, and the company did not even know the Tabors existed, much less that they owned the potentially hazardous product.  According to Metal Ware, because there is no evidence that it established or maintained a service relationship with the Tabors, there is no indication that it had an independent duty to warn under

section 13 of the Restatement.

In response, the Tabors argue that section 13 of the Restatement does not require Metal Ware to have serviced, or agreed to service, the Tabors' specific home food dehydrator unit and that the undisputed facts show that when Metal Ware acquired the assets of American Harvest, it agreed to honor all American Harvest warranties, guaranteed it would stand behind all American Harvest appliances and maintain all American Harvest service centers, and agreed to repair or replace defective products that needed warranty repair.

As noted by Metal Ware, cases cited in the comments to section 13 of the Restatement look to a number of factors in determining whether a duty to warn exists, "such as the succession to service contracts, coverage of the particular machine by a contract, service of that machine by the successor, and the successor's knowledge of the defect and of the machine owner's location." *Florom v. Elliott Mfg.*, 867 F.2d 570, 577 (10th Cir. 1989) (applying Colorado law); *see also Gee v. Tenneco, Inc.*, 615 F.2d 857, 866 (9th Cir. 1980) (applying California law); *Travis v. Harris Corp.*, 565 F.2d 443, 449 (7th Cir. 1977) (applying Indiana law). Metal Ware is also correct that several of these cited cases have looked to whether the successor's service contracts have covered, and the successor has serviced, the specific defective unit at issue. *See, e.g., Florom*, 867 F.2d at 577 ("Here there is evidence that New Elliott succeeded to Old Elliott's service contracts; provided service and parts to the particular crane involved in [the plaintiff's] injuries; and knew the name of the customer and the location of the machine."); *Gonzalez v. Rock Wool Eng'g & Equip. Co., Inc.*, 453 N.E.2d 792, 795 (Ill. Ct. App. 1983) (explaining that there was no evidence of "coverage of the particular battline machine in question under a service

contract . . . [in contrast, the evidence reveals] that [the] defendant . . . did not service, maintain, or repair the battline equipment located at Forty-Eight Insulations").

Several of these cited cases, however, do not appear to read the factors so literally as to require coverage of the very unit at issue and instead look to whether the successor covered the type of machine that caused the injury. *See, e.g., Gee*, 615 F.2d at 866 (stating that there were no facts in the record to suggest that the successor company had any relationship with users of the type of product alleged to be defective); *Tucker v. Paxson Mach. Co.*, 645 F.2d 620, 626-27 (8th Cir. 1981) (applying Missouri law) ("[The successor defendant] never agreed to assume responsibility for the servicing of the [type of defective] machines."). Courts have also emphasized that "[t]he crucial element necessary to establish a duty to warn is the 'continuation of the relationship between the successor and *the customers* of the predecessor.'" *Tucker*, 645 F.2d at 626 (quoting *Gee*, 615 F.2d at 866) (emphasis added); *see also Florom*, 867 F.2d at 577.

But, irrespective of these cases, the Utah Supreme Court has expressly directed this court that "Utah imposes on a successor corporation an independent post-sale duty to warn of a predecessor corporation's product defects *under the conditions outlined in section 13 of the Restatement (Third) of Torts*." *Tabor v. Metal Ware*, 2007 UT 71, ¶ 13, 168 P.3d 814 (emphasis added). Section 13 provides that a duty to warn lies when

> (1) the successor undertakes or agrees to provide services for
> maintenance or repair of the product or enters into a similar
> relationship with purchasers of the predecessor's products giving
> rise to actual or potential economic advantage to the successor, and
> (2) a reasonable person in the position of the successor would
> provide a warning.

Restatement (Third) of Torts:  Products Liability § 13 (1998).

Thus, even assuming, as Metal Ware contends, that section 13 asks whether the successor

company provided maintenance or repair services for the specific product unit, the language of section 13 is quite clear that a duty to warn may still exist, even if no such service has occurred, if the successor has entered into "a similar relationship with purchasers of the predecessor's products giving rise to actual or potential economic advantage to the successor." *Id*.; *see also id*. cmt. a ("This Section does not make the existence of a service contract a *sine qua non* for the imposition of a duty to warn on a successor corporation. Other similar relationships with purchasers of the predecessor's products giving rise to actual or potential economic advantage to the successor may suffice to create a duty to act reasonably and provide warnings.").

On the question of whether Metal Ware entered into a relationship with purchasers of American Harvest's products that was actually or potentially economically advantageous to the company, the court concludes that a genuine issue of material fact exists, precluding summary judgment. Here, the record indicates that Metal Ware sent a Service Agreement to potential contracting service centers. The Service Agreement provided that contracting service centers agreed to appointment as an authorized service center for American Harvest products and agreed to provide maintenance and repair service for products manufactured and distributed by American Harvest. The Service Agreement further stated that "[a]ll repairs, maintenance[,] and servicing provided [by the contracting service centers would] be in full and complete compliance with all directives, recommendation[,] and procedures that [American Harvest] establishe[d]" and American Harvest "agree[d] to sell to [the service center] . . . repair parts and attachments at prices contained in [the company's m]aster [p]arts [p]rice [l]ist." The record also indicates that attached to the Service Agreement was a letter, dated July 1, 1997, in which Metal Ware, operating under the American Harvest trade name, informed American Harvest's former service

centers that the company had changed ownership and advised them that "[w]arranties for all products produced by American Harvest [would] be honored."  The letter also stated that all claims should "be processed in the same manner" and service centers should "use all service repair manuals and price sheets issued previously."

Additionally, Youngchild's testimony suggests the possibility that some American Harvest products sold prior to the acquisition, including the model of food dehydrator purchased by the Tabors, may have been subject to, or repaired under, this warranty.  And the Service Agreement indicates coverage for the type of food dehydrator purchased by the Tabors.

Moreover, the Service Agreement indicates that Metal Ware would supply spare or repair parts.  The comment to section 13 of the Restatement provides that

> a contract is not the only method of establishing a relationship with a predecessor's customers.  For example, a successor may sell or offer to sell spare parts to the predecessor's customers for machinery sold by the predecessor when the successor knows or should know the machinery is defective.  Such conduct should be considered by courts in deciding whether sufficient actual or potential economic advantage has accrued to the successor to warrant the imposition of a duty to warn the predecessor's customers.

Restatement (Third) of Torts:  Products Liability § 13.

Assuming that the Tabors can successfully establish that Metal Ware entered into a relationship with purchasers of American Harvest products that was actually or potentially economically advantageous to Metal Ware, the court further determines that a genuine issue of material fact exists as to whether a reasonable person in Metal Ware's position would have provided a warning.  The parties disagree as to whether Metal Ware, as a result of the 1997 fire

involving the same food dehydrator model as the Tabors', knew or should have known that the

home food dehydrator posed a substantial risk of harm.

Additionally, as this court previously touched on in its discussion of causation, the

evidence is not so one-sided as to definitely suggest that Metal Ware could not have identified

those to whom a warning might be provided. Notably, in discussing the considerations relevant

to whether a reasonable person in the successor's position would have provided a warning,

section 13 of the Restatement directs attention to the comments following section 10 of the

Restatement. *See id.* cmt. c ("Whether a reasonable person in the successor's position would

provide a warning is governed by the same requirements that determine whether a reasonable

seller should provide a post-sale warning under § 10 . . . and are explained in the [c]omments to

section § 10."). Section 10 does not, as the parties do here, focus narrowly on whether the

particular plaintiff could have been identified. *See* Restatement (Third) of Torts: Products

Liability § 10 cmt. e ("In some instances, customer records may identify the population to whom

warnings should be provided. Individual names and addresses are not necessarily required.

Records may indicate classes of product users, or geographically limited markets. But when no

such records are available, the seller's inability to identify those for whom warnings would be

useful may properly prevent a post-sale duty to warn from arising.").

Likewise, section 10 does not indicate that it is necessary for the inquiry into whether a

warning can be effectively communicated, to revolve solely around the plaintiff:

> When original customer sales records indicate which individuals
> are probably using and consuming the product in question, direct
> communication of a warning may be feasible. When direct
> communication is not feasible, it may be necessary to utilize the
> public media to disseminate information regarding risks of
> substantial harm. As the group to whom warnings might be

provided increases in size, costs of communicating warnings may increase and their effectiveness may decrease.

Restatement (Third) of Torts: Products Liability § 10.

In brief, the court concludes that a genuine issue of material fact exists as to whether Metal Ware entered into a relationship with purchasers of American Harvest products that was actually or potentially economically advantageous to Metal Ware. Similarly, the court concludes that a genuine issue of material fact exists as to whether a reasonable person in Metal Ware's position would have provided a warning. Such disputed issues of material fact prohibit the court from granting Metal Ware summary judgment on the issue of duty to warn.

## CONCLUSION

The court determines that disposal of this case on summary judgment is improper. Both the parties' briefing and the record evidence before the court reveal that disputed issues of material fact exist both to causation and to whether Metal Ware had a duty to warn of the defective home food dehydrator.

Accordingly, the court DENIES Metal Ware's Motion for Summary Judgment.

DATED this 9th day of September, 2008.[5]

BY THE COURT:

_____
DALE A. KIMBALL

---

[5] The court had previously vacated the trial date scheduled for August 17, 2008, pending resolution of Metal Ware's Motion for Summary Judgment. Because the court denies Metal Ware's motion it will proceed to set a new trial date.

United States District Judge